UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CECIL STEVENS,

    Plaintiff,

v.                                    Case No. 3:23-cv-193-MMH-PDB

THE FLORIDA DEPARTMENT OF
CORRECTIONS,

    Defendant.

### ORDER

### I. Status

Plaintiff Cecil Stevens, an inmate in the custody of the Florida Department of Corrections (FDC), initiated this action through counsel by filing a Complaint (Doc. 1)[1] on February 22, 2023. Plaintiff is proceeding on an Amended Complaint (AC; Doc. 2). Plaintiff's allegations stem from a March 3, 2020 incident during which three correctional officers assaulted him at Hamilton Correctional Institution. See generally id. The FDC is the only remaining Defendant.[2] See id. at 3.

---

[1] For all pleadings and documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

[2] Plaintiff voluntarily dismissed the claims against Officer William Story Shackelford, Sergeant Ethan Burkett, and Sergeant Coty Michael Wiltgen. See Docs. 25–27.

This matter is before the Court on Defendant's Motion for Summary Judgment (Motion; Doc. 61) with exhibits (Docs. 61-1 through 61-14). The Court advised Plaintiff of the provisions of Rule 56, Federal Rules of Civil Procedure (Rule(s)), notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and permitted him an opportunity to respond to the Motion. See Summary Judgment Notice and Courtesy Copies (Doc. 64). Plaintiff filed a response in opposition to the Motion (Response; Doc. 72) with exhibits (Docs. 65-1, 66-1, 67-1, 68-1, 69-1, 70, 70-1). Defendant replied (Reply; Doc. 75). Defendant's Motion is ripe for review.

## II. Plaintiff's Allegations

Plaintiff alleges that on March 3, 2020, Sergeant Coty Michael Wiltgen, Officer William Story Shackelford, and Sergeant Ethan Burkett entered G-Dorm to conduct cell searches. See AC at 5. At that time, an inmate broke off and ran through G-Dorm. See id. Sergeant Burkett began to chase the inmate. See id. The inmate passed Plaintiff in the middle of the common area. See id. As Sergeant Burkett attempted to pass Plaintiff, Plaintiff pushed him off his path. See id. Sergeant Wiltgen pepper sprayed Plaintiff; Plaintiff walked away from Sergeant Wiltgen and laid down on the floor. See id. at 6. Sergeant

2

Wiltgen handcuffed Plaintiff, and he and Officer Shackelford escorted Plaintiff outside beyond camera view. See id. According to Plaintiff, "[t]hey passed other officers with [] [Sergeant] Wiltgen telling them they 'got it' as they passed, waving off the other officers from joining the escort." Id. Plaintiff did not resist. See id.

When Plaintiff, Sergeant Wiltgen, and Officer Shackelford arrived outside, Sergeant Wiltgen and Officer Shackelford made Plaintiff fall to the ground. See id. "Before tripping Plaintiff, [] [Sergeant] Wiltgen told Plaintiff something to the effect of 'B[****], if you want to hurt somebody, we're the ones to hurt' and said something to Plaintiff about 'putting hands on our people.'" Id. Once Plaintiff fell to the ground, Officer Shackelford struck Plaintiff in the back two times with his fists. See id. at 9. Sergeant Wiltgen kicked Plaintiff in the face and shoulders approximately 15 times. See id. at 7. Sergeant Wiltgen then backed up, spit on Plaintiff, and called him "n[*****]." Id. at 9.

When Sergeant Burkett arrived, he hit Plaintiff twice with an open hand to Plaintiff's upper back. See id. at 12. Sergeant Burkett also punched Plaintiff

3

"in the body area." Id. Plaintiff was ultimately knocked unconscious. See id. The assault lasted approximately one to two minutes. See id.

Plaintiff asserts that he has a long history of physical, mental, and intellectual impairment that substantially limits one or more major life activities. See id. at 4, 16. As a result, Plaintiff displays erratic behavior, including attempted suicide and suicidal tendencies. See id. at 4. In addition, Plaintiff has been diagnosed with antisocial personality disorder, suffers from major depression, and has a history of psychiatric treatment while in FDC custody. See id. at 5.

According to Plaintiff, his disabilities "were known to Defendant FDC and its agents and employees," including Sergeant Wiltgen, Officer Shackelford, and Sergeant Burkett; he asserts that the brutal attack constituted discrimination because it occurred based on his physical, mental, and intellectual disabilities. See id. at 16–17. Plaintiff further alleges that the FDC showed discriminatory intent and failed to accommodate his disabilities when it: (1) failed to train FDC correctional officers and other employees and agents regarding the safe management of disabled inmates; (2) failed to consider Plaintiff's particular disabilities at the time of the March 3, 2020 assault; (3) permitted officers to unjustifiably restrain, beat, and abuse

4

Plaintiff because he is different than inmates without disabilities; and (4) failed to use alternatives to force to manage Plaintiff. See id. at 17–18. Based on the above, Plaintiff alleges the FDC violated the Americans with Disabilities Act and Rehabilitation Act. See id. at 15–21. Plaintiff requests damages. See id. at 19, 21.

### III. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[3] An issue is genuine when the evidence is such that a reasonable

---

[3] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.
> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

5

jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to

---

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

    In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. Gov't Emps. Ins. Co., 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Applicable Law

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Only

public entities are liable for violations of Title II of the ADA." Edison v. Douberly, 604 F.3d 1307, 1308 (11th Cir. 2010). State prisons are public entities for purposes of the ADA, and therefore subject to suit under the ADA. See Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998).

"To state a claim under Title II of the ADA, a plaintiff must allege: (1) that he is a 'qualified individual with a disability;' (2) that he was 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.'" Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. § 12132).[4]

## V. Summary of the Arguments

Defendant argues Plaintiff's ADA and RA claims fail because: (1) Plaintiff is not a qualified individual with a disability; (2) Plaintiff fails to allege he was excluded from participation in or denied the benefits of any FDC services, programs, or activities; (3) Plaintiff does not cite to any evidence that the March 3, 2020 assault was on the basis of his alleged disability; (4) Plaintiff

---

[4] Given the textual similarities between the ADA and the RA, the same standards govern both claims, and courts rely on cases construing the acts interchangeably. See Ingram v. Kubik, 30 F.4th 1241, 1256 (11th Cir. 2022). Accordingly, the Court will refer primarily to the ADA for the sake of brevity.

8

proceeds under a theory of vicarious liability; and (5) Defendant is entitled to sovereign immunity. See Motion at 12–23.

Plaintiff responds that: (1) he is a qualified individual with a disability as evidenced by his own declaration as well as FDC mental health records, see Response at 8–10, and (2) contrary to Defendant's argument that there is no evidence the assault was based on his disability, Plaintiff's testimony suggests Sergeant Burkett knew he was mentally impaired, see id. at 15–16. Moreover, (3) the testimony of Sergeant Burkett and Officer Shackelford support Plaintiff's claim that Defendant failed and intentionally refused to train correctional officers regarding the safe management of mentally disabled inmates. See id. at 16–17. Finally, Plaintiff asserts that (4) Defendant may be held liable under the ADA and RA for the actions of its officials with supervisory authority, including sergeants, and (5) Defendant is not entitled to sovereign immunity. See id. at 12–15, 18.

## VI. Analysis and Conclusions

Assuming arguendo Plaintiff is a qualified individual with a disability, the Court finds Defendant is nevertheless entitled to summary judgment. The uncontroverted evidence suggests only that the March 3, 2020 assault was retaliation for Plaintiff pushing a correctional officer—Sergeant Burkett—not

9

because of Plaintiff's disability.[5] Importantly, the correctional officers who instigated the assault—Sergeant Wiltgen and Officer Shackelford—did not know Plaintiff had diagnosed mental disabilities. See Doc. 61-12 at 47–48. And, Sergeant Burkett similarly did not know Plaintiff suffered from mental disabilities. See Doc. 61-13 at 52–53.

Before the assault, Sergeant Wiltgen, Officer Shackelford, and Sergeant Burkett were conducting searches of inmates' cells in G-Dorm. See Doc. 61-1. An inmate broke from the search and ran through G-Dorm. See id. As Sergeant Burkett pursued the inmate, Plaintiff pushed Sergeant Burkett. See id. Sergeant Wiltgen handcuffed Plaintiff and escorted him outside of camera view. See id. Sergeant Wiltgen and Officer Shackelford began the assault, which Sergeant Burkett later joined. See Docs. 61-2 at 20, 61-3 at 19, 61-4 at 17–18.

In his deposition testimony, Sergeant Wiltgen explained that he assaulted Plaintiff to exact "justice" for Plaintiff placing his hands on a fellow officer. Doc. 61-12 at 49. He testified:

> In the stress of the situation and in just a stressful environment, it is us against them. In my own way, I decided to take this justice into my own hands, which

---

[5] Defendant does not dispute that Sergeant Wiltgen, Officer Shackelford, and Sergeant Burkett unlawfully assaulted Plaintiff outside of G-Dorm on March 3, 2020. See Motion at 5–7.

10

> was completely unjustified. And that's about the biggest understanding is, like I said, it is us – in the prison, it is us against them. And that is not something that should be tolerated was putting hands on another staff member. It does not need the reprisal that it was given by no means. . . .
>
> . . . .
>
> I did. I lost my temper. And I let my feelings get the better of me – my own personal feelings – instead of being – like, separating myself from the thing, separating from – separating myself. I let my feelings get the best of me.

Id. at 49–50.

Other evidence similarly shows Sergeant Wiltgen simply lost his temper in the moment because of Plaintiff's contemporaneous behavior, but not because of what may have motivated Plaintiff's behavior (a disability). When questioned during his deposition about a motive for the assault, Lead Senior Inspector Chester Potter of the FDC's Office of the Inspector General (OIG) surmised that if he "were to call it a motive, it would have been a racial issue" because the correctional officers called Plaintiff a racial slur while they beat him. Doc. 61-14 at 58. He also noted that in his experience, an officer takes it "very personal" when an inmate puts his hands on a fellow officer, and it can lead to retaliation. Id. Indeed, the OIG Investigative Activity Report detailed statements from multiple witnesses who reported hearing the correctional

11

officers call Plaintiff a racial slur and telling him to "try that s[***] now." Doc. 61-10 at 6–11. And Plaintiff alleges in the AC that before tripping him, Sergeant Wiltgen stated "'B[****], if you want to hurt somebody, we're the ones to hurt' and said something to [him] about 'putting hands on our people.'" AC at 6.

Plaintiff points to no evidence to the contrary. However, he does point to evidence which he believes demonstrates that the FDC failed to train correctional officers regarding the safe management of disabled inmates, which allegedly resulted in the assault of Plaintiff, and that Sergeant Burkett knew of his disability. In particular, he provides an expert report by Aubrey Land, see Doc. 69-1, and Plaintiff's declaration, see Doc. 70. Defendant has contested both pieces of evidence. See Motion to Exclude Expert Opinion Testimony of Aubrey Land and Incorporated Memorandum of Law (Doc. 62); Motion to Strike (Doc. 76). Even considering this evidence, the Court finds that Defendant is still entitled to summary judgment.

In his report, Land opines that "there is a culture in the [FDC] that allow[s] the abuse of inmates who have mental health issues and who are protected against such abuse under the Americans with Disability Act."[6] Doc.

---

[6] Plaintiff does not oppose the exclusion of Land's other opinions. See Doc. 73 at 7–8.

69-1 at 12. According to Land, Officer Shackelford stated during his interview that "he never received any training on dealing with inmates with mental health issues . . . and advised it was common practice for staff to show prejudice towards inmates with mental issues . . . ." Id. at 8; see also Docs. 65-1 at 25 (Officer Shackelford deposition), 66-1 at 28 (Sergeant Burkett deposition). However, Plaintiff has not established the requisite causal connection between the assault underlying his claim and any alleged culture of abuse, especially where the evidence does not even suggest the assault was because of Plaintiff's disability. Besides the lack of evidence suggesting that discriminatory animus towards mental disabilities motivated the correctional officers, Plaintiff neither provides evidence nor pleads any facts to suggest his actions prior to the assault stemmed from his disability. For example, he does not allege that he pushed Sergeant Burkett because he was hallucinating or having a psychotic episode. As such Plaintiff fails to connect the alleged discriminatory policy to the assault that caused the injuries for which he seeks redress.

Next, Plaintiff points to an October 2019 incident that he describes in his declaration as evidence that Sergeant Burkett knew he was disabled. See Doc. 70 at 11–13. According to Plaintiff, the following occurred:

> As soon as I entered the Confinement area, I was met by Sergeant Burkett, whose first words were, "put

13

that retarded ["N" word] in the shower and strip search him until I can find a cell to put him in. After being strip searched, I told the escorting officer that I had a Psychological Emergency, because at that moment, I was feeling suicidal. The escorting officer replied, "I advise you to fall back because you have the wrong sergeant [i.e.., Sergeant Burkett] on shift for that psyche s**t." The officer added, "Look, I don't know what institution you came here from, but there's no such thing as a psychological emergency here." I replied, "You think I won't kill myself, huh?" I then removed my sweater, twisting it into a makeshift rope and fashioning it into a "noose." I tied it to the shower bars and attempted to hang myself. I was certainly not pretending at that time. I felt so abused, neglected, and humiliated, and so despondent, that I truly did intend to kill myself.

The escorting officer then called Sergeant Burkett on his walkie-talkie and notified Burkett of the situation. Twenty to thirty seconds later, Sergeant Burkett arrived, cut me down from the bars, and sprayed me in the face and mouth with chemical agents. Burkett then activated his body alarm and several officers arrived and escorted me to another wing for a decontamination shower.

Sergeant Burkett then had me placed into a so-called "dry cell," which is a cell without a sink or toilet, clothed in nothing but boxer shorts. A few minutes later, I attempted to kill myself by choking, using the elastic band from the boxer shorts. Again, I was not pretending on that occasion. A Confinement Officer observed this and notified Sergeant Burkett. Within 10 to 20 seconds, Burkett arrived and again sprayed me with chemical agents. While he was spraying me, he again called me a "retard" and the "N" word and threatened that he would harm me when I got back to

14

> General Population. While I was in Confinement, Burkett refused me my lunch and dinner trays whenever he was on shift.
>
> After I was released from Confinement, and Sergeant Burkett worked G-Dorm, he frequently ridiculed me for being a "retard" or "retarded," and called me racist names. He would also refuse to allow me to go to the Canteen and would threaten to beat me up.

Id. (enumeration omitted). Sergeant Burkett's knowledge of Plaintiff's suicide attempt several months before the assault does not necessarily show that Sergeant Burkett knew Plaintiff had a diagnosed disability.

Even if Sergeant Burkett knew about Plaintiff's disabilities, it does not follow that it was the motivation behind the assault. Sergeant Wiltgen and Officer Shackelford, not Sergeant Burkett, initially escorted Plaintiff outside and began to assault him. Sergeant Burkett only later joined them. Sergeant Wiltgen did not know of Plaintiff's mental health history, and Sergeant Wiltgen and Officer Shackelford's remarks during the assault do not support even an inference of any sort of discriminatory animus based on disability.

Having determined that the assault that forms the basis for Plaintiff's claims was not because of his alleged disability, there is no basis for a failure to train claim. See Bates ex rel. Johns v. Chesterfield Cnty., 216 F.3d 367, 373 n.3 (4th Cir. 2000). Moreover, to the extent Plaintiff pursues a claim based on

15

the denial of the benefits of the services, programs, or activities on the basis of his disability, his claim fails because the AC wholly fails to describe which service, program, or activity Plaintiff was entitled to participate in but to which he was denied access. Accordingly, Defendant's Motion is due to be granted.[7]

Therefore, it is now **ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. 61) is **GRANTED**.

2. Defendant's Motion to Exclude Expert Opinion Testimony of Aubrey Land (Doc. 62) and Motion to Strike (Doc. 76) are **DENIED as moot**.

3. Plaintiff's Motion for Writ of Habeas Corpus Testificandum to Appear and Testify at his Trial (Doc. 80) is **DENIED as moot**.

4. The **Clerk** shall enter judgment in favor of Defendant and against Plaintiff, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 29th day of August, 2025.

MARCIA MORALES HOWARD
United States District Judge

---

[7] For the same reasons previously detailed, Defendant is entitled to summary judgment on its RA claim.

Jax-9 8/19
c:      Counsel of record

17